*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| KENNETH H. MANNING, | ) | |
| | ) | Supreme Court Nos. S-16511/16531 |
| Appellant and | ) | |
| Cross-Appellee, | ) | Superior Court No. 3KN-13-00708 CI |
| | ) | |
| v. | ) | O P I N I O N |
| | ) | |
| STATE OF ALASKA, | ) | No. 7252 – June 22, 2018 |
| DEPARTMENT OF FISH AND | ) | |
| GAME, | ) | |
| | ) | |
| Appellee and | ) | |
| Cross-Appellant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| AHTNA TENE NENÉ, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Kenai, Charles T. Huguelet, Judge.

Appearances: Kenneth H. Manning, pro se, Kasilof, Appellant and Cross-Appellee. Cheryl R. Brooking, Assistant Attorney General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for Appellee and Cross-Appellant State of Alaska, Department of Fish and Game. John M. Starkey, Anna C. Crary, and Andrew Erickson, Landye Bennett Blumstein LLP, Anchorage, for Appellee Ahtna Tene Nené.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

BOLGER, Justice.

## I.      INTRODUCTION

This appeal is the latest in a series of successive appeals brought by Kenneth Manning challenging the moose and caribou subsistence hunt regulations that govern a portion of southcentral Alaska. Manning filed this lawsuit in 2013 challenging the eligibility criteria for subsistence hunt permits, the point system for allocating Tier II subsistence permits, and the criteria for establishing nonsubsistence hunting areas. While these claims were pending in the superior court, we issued a 2015 decision resolving similar claims brought by Manning in an earlier suit. Manning then moved to amend his complaint in this case and to add an individual official as a defendant. The superior court denied both motions, concluding that amendment would be futile because all of Manning's claims would fail under our precedent. The superior court also denied the State's motion for attorney's fees, concluding that Manning was exempt from an adverse attorney's fees award under the constitutional litigant exception.

Manning appeals the denial of his motion to amend; he also raises various allegations of deprivation of due process. The State cross-appeals the denial of its motion for attorney's fees. We affirm the denial of the motion to amend because Manning failed to adequately brief — and thus forfeited — his arguments on some of the counts, and the remaining counts would have been futile. And we affirm the denial of attorney's fees to the State because none of Manning's claims are frivolous.[1]

---

[1]      In addition to Manning's appeal and the State's cross-appeal, Ahtna Tene Nené, the other defendant in the superior court proceeding, asks us to vacate a 2010 superior court order entered in a prior suit brought by Manning to which Ahtna was also

(continued...)

## II. FACTS AND PROCEEDINGS

### A. Regulatory Background

Manning challenges several aspects of the regulations governing the moose and caribou community subsistence hunt in Game Management Unit 13 (GMU 13), an area that encompasses 23,000 square miles known as the Nelchina basin.[2] Our prior opinions have discussed at length the subsistence hunt permitting system for this area; we provide a synopsis here.[3]

Alaska's subsistence statute governs the allocation of game in subsistence areas.[4] It requires the Board of Game to determine the amount of the harvestable game population in a subsistence area "that is reasonably necessary for subsistence uses" and to adopt regulations providing "a reasonable opportunity" for such subsistence uses.[5] The Board recognizes two separate patterns of subsistence use of moose and caribou

---

[1]        (...continued)
a party. But Ahtna does not explain how the instant appeal provides jurisdiction to vacate an order issued in an entirely separate case. *See* AS 22.05.010 (outlining our jurisdiction). We therefore do not address this claim.

[2]        *Ahtna Tene Nené v. State, Dep't of Fish & Game*, 288 P.3d 452, 455 (Alaska 2012).

[3]        We describe the regulations governing the moose and caribou subsistence hunt in GMU 13 as they existed at the time Manning filed his proposed amended complaint. To the extent these regulations have subsequently changed, we do not address those changes.

[4]        *See* AS 16.05.258.

[5]        AS 16.05.258(b). Subsistence uses are the "noncommercial, customary and traditional uses of wild, renewable resources . . . for direct personal or family consumption." AS 16.05.940(34).

within GMU 13.[6] The first pattern is a community-based pattern of subsistence hunting that originated within Ahtna Athabascan communities and was later adopted by other Alaskans.[7] The community-based pattern is characterized by use of the entire caribou or moose (except the antlers), cooperation amongst community members, and widespread sharing after the harvest.[8] The second pattern is an individual-use pattern, which is similarly widespread but, unlike the community-based pattern, does not necessarily involve cooperation and sharing.[9] Those who engage in the individual-use pattern tend to hunt primarily in the fall season, travel farther to hunt, and hunt in areas accessible from the road system.[10] And these individual hunters generally do not use the entire moose or caribou.[11]

The Board manages subsistence hunting permits at either a Tier I or Tier II level.[12] It manages the hunt using Tier I permits when the game population is sufficient to satisfy all subsistence uses.[13] Generally, under Tier I, all applicants who are Alaska

---

[6]     These two patterns were identified in 2006 and 2011 after the Board held public hearings and made extensive factual findings. *Alaska Fish & Wildlife Conservation Fund v. State* (*AFWCF*), 347 P.3d 97, 100-01 (Alaska 2015).

[7]     *Id.* at 100.

[8]     *Id.*

[9]     *Id.* at 101.

[10]     *Id.*

[11]     *Id.*

[12]     *Manning v. State, Dep't of Fish & Game* (*Manning II*), 355 P.3d 530, 532 (Alaska 2015).

[13]     *Id.*; *see* AS 16.05.258(b).

residents and meet the criteria of one of the two patterns of subsistence use of moose and caribou within GMU 13 will be able to obtain a permit.[14]

If the harvestable portion is insufficient to satisfy all subsistence uses, the Board manages the subsistence hunt using Tier II permits.[15] Tier II permits are more limited and thus have stricter eligibility criteria.[16] The Board determines a subsistence hunter's eligibility for a Tier II permit based on (1) the user's "customary and direct dependence on the game population . . . for human consumption as a mainstay of livelihood" and (2) the user's "ability . . . to obtain food if subsistence use is restricted or eliminated."[17]

The Board uses a multi-factor point system to assess how each applicant satisfies these criteria and to allocate Tier II permits among applicants.[18] It assesses the first criterion, the user's customary and direct dependence, based in part on "the amount of time during the year the applicant spends in the noncommercial harvesting of wild fish

---

[14]    5 Alaska Administrative Code (AAC) 85.025(a)(8), 85.045(a)(11) (2016 & Supp. 2018).

[15]    *State, Dep't of Fish & Game v. Manning* (*Manning I*), 161 P.3d 1215, 1216-17 (Alaska 2007).

[16]    *Id.*

[17]    *Id.* at 1217 (quoting 5 AAC 92.062(a)). The statute identifies a third consideration for Tier II permits: "the proximity of the domicile of the subsistence user to the stock or population." AS 16.05.258(b)(4)(B)(ii). But in 1995 we held this consideration unconstitutional because it was a residency-based eligibility restriction on subsistence use. *State v. Kenaitze Indian Tribe*, 894 P.2d 632, 638-39 (Alaska 1995).

[18]    *Manning I*, 161 P.3d at 1217; *see* 5 AAC 92.070.

and game within the hunt area boundary" (the "annual hunting factor").[19] And the Board assesses the second criterion, the user's ability to obtain food through nonsubsistence means, based on the cost of gasoline and food "in the community where most of the applicant's household's store-bought food [and gasoline were] purchased during the past year."[20]

The moose and caribou subsistence hunt in GMU 13 is currently managed under a Tier I permitting system.[21] In accordance with the two recognized subsistence use patterns, the Board issues two different types of Tier I subsistence hunt permits for GMU 13: a community harvest permit and an individual hunt permit.[22] The community harvest permit is available to an applicant who is a member of a group or community of at least 25 individuals, provided that the applicant "make efforts to ensure that the . . . customary and traditional use pattern . . . is observed" (e.g., meat sharing and organ salvage).[23] The community harvest permit application contains a certification statement that requires a certification that an applicant will "observe the customary and traditional

---

[19]     5 AAC 92.070(a)(3).  The user can receive a maximum of 25 points by spending 70 or more days hunting or fishing in the area.  5 AAC 92.070(a)(3)(F).

[20]     5 AAC 92.070(b)(2)-(3). The number of points the applicant receives for the cost of food and gas "may not exceed the points calculated . . . using the cost . . . for the community nearest the applicant's residence."  *Id.*

[21]     *2018-2019 Alaska Subsistence Permit Hunt Supplement*, ALASKA DEP'T OF FISH AND GAME 4, http://www.adfg.alaska.gov/static/applications/ web/nocache/license/huntlicense/pdfs/2018-2019_subsistence_supplement.pdf4C9D CD34A620FB0FD26E1D1DAA715A24/2018-2019_subsistence_supplement.pdf; *see Manning II*, 355 P.3d 530, 533 (Alaska 2015) (describing transition to Tier I system in GMU 13).

[22]     *AFWCF*, 347 P.3d 97, 101 (Alaska 2015).

[23]     5 AAC 92.072(c)(1)(D); *AFWCF*, 347 P.3d at 101.

use patterns" of the community subsistence hunt.[24] The individual subsistence hunt permit for caribou is available annually to each eligible Alaska resident who applies.[25] No permit is required for the individual subsistence moose hunt in GMU 13.[26] Individual subsistence hunters are not subject to the customary and traditional use requirement applicable to community harvest permit holders.[27] All subsistence permit holders for caribou in GMU 13 are subject to the same regulations and enjoy the same hunting season and hunting area.[28] For moose, community harvest permit holders enjoy a longer hunting season and a larger hunting area than individual users — and unlike individual users, they are not limited to taking moose with certain antler sizes and configurations — distinctions we have previously upheld as neither arbitrary nor unreasonable.[29]

---

[24]   The certification statement further states that providing false information in the permit application "is subject to a maximum penalty of either a $10,000 fine or 1 year imprisonment, or both."

[25]   5 AAC 92.071; *see* 5 AAC 92.050.  Each household is limited to one individual use permit in GMU 13.  5 AAC 92.050(a)(4)(I). But this limit does not disadvantage individual use permit holders because, although a similar limit does not apply to community harvest permit holders, all households are limited to one caribou per household regardless of the type of subsistence use permit its members hold.  *AFWCF*, 347 P.3d at 101 & n.8; *see* 5 AAC 92.071(a); 5 AAC 92.072(c)(2)(A).

[26]   5 AAC 85.045(a)(11).

[27]   *Manning II*, 355 P.3d 530, 533 (Alaska 2015); *see* 5 AAC 92.071(a). Individual use permit holders for the caribou hunt in GMU 13 are, however, prohibited from hunting moose or caribou elsewhere in the state for the regulatory year during which they hold the permit.  5 AAC 92.050(a)(4)(I).

[28]   *Manning II*, 355 P.3d at 533; *see* 5 AAC 85.025(a)(8)(A); 5 AAC 92.072(d).

[29]   *AFWCF*, 347 P.3d at 101, 106; *see* 5 AAC 85.045(a)(11).

In addition to regulating subsistence areas, the subsistence statute also requires the Board to identify nonsubsistence areas, that is, "area[s] or communit[ies] where dependence upon subsistence is not a principal characteristic of the economy, culture, and way of life."[30]  In determining whether an area fits this description, the Board must consider various socioeconomic factors.[31]  In nonsubsistence areas, no subsistence permits are issued and the usual priority for subsistence uses over sport and commercial uses does not apply.[32]  The Board has established five nonsubsistence areas in the state, including the Anchorage-Matsu-Kenai Nonsubsistence Area.[33]  This area encompasses most of the Kenai Peninsula, all of the Municipality of Anchorage, and a large portion of the Matanuska-Susitna Borough.[34]

## B.    Proceedings

In August 2013 Manning filed suit against the Department of Fish and Game challenging the constitutionality of the statutes and regulations governing: (1) the subsistence hunt for moose and caribou in GMU 13; (2) the Tier II permit scoring system; and (3) the designation of a nonsubsistence area.  In January 2014 the superior

---

[30]    AS 16.05.258(c).

[31]    *Id.*

[32]    *State v. Kenaitze Indian Tribe*, 894 P.2d 632, 633, 639 (Alaska 1995).

[33]    5 AAC 99.015.

[34]    *State v. Kenaitze Indian Tribe*, 83 P.3d 1060, 1063 (Alaska 2004).

court granted the motion of the local tribe, Ahtna Tene Nené, to intervene as a defendant.[35] That month, the superior court also issued a routine pretrial scheduling order.

In August 2014 Manning moved to stay the pretrial scheduling order until we decided an appeal in an earlier case he had brought, which was pending at the time (*Manning II*[36]). Manning's motion asserted that a stay was required because "[t]he pending Alaska Supreme Court case is controlling for many of the issues in this matter." The State and Ahtna agreed that the suit should be put on hold but argued that a stay of the pretrial scheduling order was inappropriate and that the order should instead be vacated. The next month the superior court granted the State's and Ahtna's motions and vacated the pretrial scheduling order pending the outcome of *Manning II*.

We issued a decision in *Manning II* in May 2015.[37] The superior court held a status conference in July, at which it agreed to extend the stay to allow Manning time to seek rehearing in *Manning II*. We subsequently denied Manning's petition for rehearing, after which Manning filed a petition for certiorari with the U.S. Supreme Court. At another status hearing in January 2016, the superior court again extended the stay pending resolution of the petition for certiorari. The superior court stated that if the

---

[35] Ahtna "is an organization composed of representatives from the eight federally recognized Native Villages in the Ahtna region[:] Gulkana, Cantwell, Chistochina, Gakona, Mentasta, Tazlina, Chitina, and Kluti Kaah." "The Ahtna people have hunted caribou and moose for centuries in Alaska, primarily in [the] region [encompassed by GMU 13]." *Ahtna Tene Nené v. State, Dep't of Fish & Game*, 288 P.3d 452, 455 (Alaska 2012).

[36] 355 P.3d 530 (Alaska 2015).

[37] We later granted the State's petition for rehearing and issued a superseding opinion in August 2015. *See id.*

Supreme Court rejected Manning's petition, he would have 30 days to file a motion to amend his complaint. The Supreme Court denied certiorari the next month.

In March 2016 Manning timely moved to amend his complaint. His two-sentence motion did not offer any justification for amendment. Manning's proposed amended complaint asserted three claims: (1) the requirement that community harvest permit holders observe the customs and traditions of the community-based pattern of subsistence hunting identified by the Board violates the federal and state equal protection clauses,[38] the equal access clauses of the Alaska Constitution,[39] the public trust doctrine, the Extinguishment Clause of the Alaska Native Claims Settlement Act (ANCSA),[40] the Alaska Statehood Act,[41] and certain other statutes;[42] (2) some of the criteria considered in allocating Tier II subsistence permits (the cost of groceries and gasoline and the

---

[38]     U.S. Const. amend. XIV, § 1; Alaska Const. art. I, § 1.

[39]     Alaska Const. art. VIII, § 3 ("Wherever occurring in their natural state, fish, wildlife, and waters are reserved to the people for common use."); Alaska Const. art. VIII, § 15 ("No exclusive right or special privilege of fishery shall be created or authorized in the natural waters of the State."); Alaska Const. art. VIII, § 17 ("Laws and regulations governing the use or disposal of natural resources shall apply equally to all persons similarly situated with reference to the subject matter and purpose to be served by the law or regulation."); *see AFWCF*, 347 P.3d 97, 102 (Alaska 2015) ("Sections 3, 15, and 17 of article VIII are the equal access clauses of the Alaska Constitution . . . .").

[40]     Manning's proposed amended complaint cites to a section of ANCSA that does not exist. We follow the presumption set forth in Ahtna's brief that Manning intended to cite to the Extinguishment Clause. The Extinguishment Clause provides that "[a]ll aboriginal titles . . . and claims of aboriginal title in Alaska based on use and occupancy, . . . including any aboriginal hunting or fishing rights that may exist, are . . . extinguished." 43 U.S.C. § 1603(b) (2012).

[41]     Pub. L. No. 85-508, 72 Stat. 339 (1958).

[42]     AS 16.05.255; AS 16.05.258.

annual hunting factor) violate the federal and state equal protection clauses and the equal access clauses of the Alaska Constitution; and (3) the criteria used to establish nonsubsistence hunt areas violate the federal and state equal protection clauses. The proposed amended complaint requested relief in the form of monetary damages totaling $2.64 million, a portion of which Manning asserted he would "distribute[]" at his "discretion" to other communities whose rights had been similarly violated. In addition, the next month, Manning moved to add Ted Spraker, Board chair, as a defendant in both "his official and personal capacity." The motion stated simply that the addition of Spraker was necessary to protect Manning's rights and to secure "an appropriate award of damages." Both the State and Ahtna opposed Manning's motions on the basis that each of the claims in his proposed amended complaint was futile, as was the addition of Spraker as a defendant.

In August 2016, after holding oral argument on both of Manning's motions, the superior court denied them on the basis that each claim in the proposed amended complaint, as well as the addition of Spraker as a defendant, was futile. Specifically, the superior court reasoned that we had either already directly resolved Manning's claims (in a manner adverse to Manning) or the claims would be defeated by the reasoning of our prior opinions.

Manning did not request reconsideration of either motion. Instead, he moved to voluntarily dismiss his 2013 complaint. The motion noted that dismissal was appropriate because our decisions had "resolved numerous claims in this case" and because the superior court had denied his motion to amend. The State and Ahtna jointly submitted a proposed final judgment dismissing Manning's claims with prejudice. Manning opposed the joint motion, urging that no court had yet addressed his claims on the merits and that final judgment was "premature." He asserted that final judgment

would deny him "substantive and procedural due process." He advocated instead for voluntary dismissal, which would be without prejudice.

The superior court granted the State and Ahtna's joint motion and entered final judgment in their favor, dismissing all of Manning's claims with prejudice. The court denied Manning's motion to reconsider its entry of final judgment and his motion for a new trial. The State then moved for attorney's fees in the amount of $3,479 (20% of its reasonable fees). The State also urged that an enhanced attorney's fees award was warranted based on the frivolous nature of Manning's claims, or, that at the very least, the unreasonableness of his claims should be used to offset any reduction in fees the court might be inclined to grant due to Manning's pro se status.[43] Manning opposed this motion on the basis that the constitutional litigant exception exempted him from an adverse attorney's fees award.[44] The superior court denied the State's motion for attorney's fees. The superior court concluded that Manning's claims were not frivolous for the purpose of the constitutional litigant exception and that the State was therefore not entitled to any attorney's fees.

Manning appeals the superior court's denial of his motion to amend his complaint and his motion to add a defendant. The State cross-appeals the superior court's order denying its attorney's fees motion.

---

[43]     Ahtna also moved for attorney's fees, but unlike the State, it does not appeal the denial of this motion. Accordingly, we do not address Ahtna's attorney's fees motion.

[44]     *See* AS 09.60.010(c)(2) (prohibiting courts from awarding attorney's fees against a nonprevailing litigant if the litigant's claims "concern[] the establishment, protection, or enforcement of a right under the [federal or state constitutions]," provided that the litigant "did not have sufficient economic incentive to bring the action" and that the claims were "not frivolous").

## III. STANDARD OF REVIEW

We review the denial of a motion to amend a complaint for abuse of discretion.[45] It is within a trial court's discretion to deny a motion to amend a complaint "where amendment would be futile because it advances a claim . . . that is legally insufficient on its face."[46] We review the superior court's futility determination using our independent judgment.[47]

In addition, we generally review an attorney's fees award for abuse of discretion, which we find when an award is "arbitrary, capricious, manifestly unreasonable, or the result of an improper motive."[48] Interpretation of the constitutional litigant exception to attorney's fees is a question of law, which we review using our independent judgment.[49]

## IV. DISCUSSION

### A. Each Claim In Manning's Proposed Amended Complaint Is Either Futile Or Forfeited.

Manning appeals the superior court's denial of his motions to amend his complaint and to add Spraker as a defendant. The superior court denied these motions after concluding that all of the claims in the proposed amended complaint, along with the

---

[45] *Patterson v. GEICO Gen. Ins. Co.*, 347 P.3d 562, 568 (Alaska 2015).

[46] *Id.* (quoting *Krause v. Matanuska-Susitna Borough*, 229 P.3d 168, 174 (Alaska 2010)).

[47] *Id.*

[48] *DeVilbiss v. Matanuska-Susitna Borough*, 356 P.3d 290, 294 (Alaska 2015) (quoting *Bachner Co. v. Weed*, 315 P.3d 1184, 1189 (Alaska 2013)).

[49] *Alaska Conservation Found. v. Pebble Ltd. P'ship*, 350 P.3d 273, 279 (Alaska 2015).

addition of Spraker, would be futile because the claims had been previously resolved (directly and indirectly) by our precedent. We consider each of the three claims in the proposed amended complaint, as well as the proposed additional party, in turn.[50] We then address the additional due process arguments that Manning raises on appeal.

### 1.    First count in the proposed amended complaint

The first count in Manning's proposed amended complaint alleges that the conditions required to receive a community harvest permit violate the federal and state equal protection clauses and the equal access clauses of the Alaska Constitution.[51] The crux of this argument is that the requirement that community harvest permit holders observe the customary and traditional pattern of use identified in the Board's findings[52] constitutes racial discrimination because that pattern is derived from the practices of the

---

[50]    We do not examine the validity of any of the claims raised in Manning's original complaint because his arguments on appeal relate only to the claims in his proposed amended complaint.

[51]    Manning's proposed amended complaint also challenged the permit requirement on the basis that the requirement violated the Extinguishment Clause of ANCSA, the public trust doctrine, and the Alaska Statehood Act. However, Manning failed to assert these arguments in his initial brief on appeal, and his discussion of these issues in his reply brief is too cursory to comprehend. Therefore, we conclude that he has forfeited these arguments, and we decline to consider them. *See Barnett v. Barnett*, 238 P.3d 594, 602-03 (Alaska 2010) ("[W]e deem waived any arguments raised for the first time in a reply brief . . . ."). We further note that Manning appears to argue in his initial brief that the permit requirement is unauthorized by AS 16.05.258 and other statutes, a claim he made in his proposed amended complaint. But this argument appears to depend on his contention that the permit requirement is unconstitutional, and to the extent it does not, it is too cursory to comprehend and thus is forfeited. *See Hagen v. Strobel*, 353 P.3d 799, 805 (Alaska 2015) ("[W]here a point is given only a cursory statement in the argument portion of a brief, the point will not be considered on appeal." (alteration in original) (quoting *Glover v. Ranney*, 314 P.3d 535, 545 (Alaska 2013))).

[52]    *See* 5 AAC 92.072(c)(1)(D).

Ahtna community. According to Manning, this permit condition requires that he either "convert to Ahtna local racial customs and traditions" or be disadvantaged in the subsistence hunt permitting process. (Emphasis omitted.)

We rejected in two prior cases the contention that the community harvest permit conditions implicate the equal protection and equal access clauses. In *Alaska Fish & Wildlife Conservation Fund v. State* (*AFWCF*), we considered a nonprofit organization's argument that the Board's system of bifurcating the individual hunt and the community hunt in GMU 13 violated the equal protection and equal access clauses of the Alaska Constitution by establishing a preference for rural hunters.[53] We upheld the bifurcated hunt system on the basis that the community harvest permit system applied equally to all Alaska citizens and thus did not implicate equal protection or the equal access clauses.[54] We reasoned that "[a]ll Alaskans are eligible to receive a community harvest permit; the only requirement for obtaining one is collaboration with other resource users."[55] Although we recognized that this collaboration requirement might be "inconvenient for those who lack a ready community," inconvenience was not a sufficient bar to access to implicate constitutional rights.[56] Furthermore, those who chose not to collaborate could simply apply for an individual hunt permit.[57] We additionally explained that only a regulation that differentiated between resource user groups would

---

[53]     347 P.3d 97, 100 (Alaska 2015).

[54]     *Id.* at 100, 102-03.

[55]     *Id.* at 103.

[56]     *Id.*

[57]     *Id.*

implicate constitutional rights and that user groups are defined based on the nature of the resource or use rather than the means of accessing the resource.[58]

We reiterated this holding a few months later in *Manning II*. In that case, we expressly rejected Manning's argument "that the community harvest permit eligibility criteria are unconstitutional" under the equal protection and equal access clauses, noting that "we [had] upheld the constitutionality of these criteria in *AFWCF*."[59] We also addressed Manning's related argument that the Board's method of calculating the amount of caribou that was reasonably necessary for subsistence in GMU 13 relied on unconstitutional racial factors — namely, Ahtna customs and traditions.[60] We rejected this argument because "[t]he Board's subsistence definition applies equally to all of Alaska's citizens."[61] Therefore, we concluded, the Board's method of relying on Ahtna customs and traditions in calculating the harvestable amount "does not implicate, nor violate, the equal access, uniform application, or equal protection clauses of the Alaska Constitution."[62]

Similarly, the community hunt permit condition that Manning is challenging in this appeal also does not implicate either equal protection or the equal access clauses. The permit condition applies equally to all Alaskans, does not meaningfully limit admission to the user group, and does not discriminate between user groups. All Alaskans are eligible for a community harvest permit; the only requirements

---

[58]     *Id.* at 102-03.

[59]     *Manning II*, 355 P.3d 530, 538 (Alaska 2015).

[60]     *Id.* at 532, 536.

[61]     *Id.* at 536.

[62]     *Id.*

are finding a group of other hunters with whom to collaborate and complying with the "applicable customary and traditional use pattern."[63] Any inconvenience these requirements may pose does not implicate constitutional rights.[64]

Manning attempts to distinguish his argument from our prior holdings by emphasizing the *racial* discrimination aspect of his argument. He claims that our prior cases did not involve allegations of racial discrimination and thus do not address or resolve his claim in this appeal. Manning's argument is inapposite; as discussed above, we have already held that the community subsistence hunt regulations apply equally to all Alaska residents and do not implicate the equal protection or equal access clauses. At least implicit in this holding is a conclusion that the regulations are not racially discriminatory, as such discrimination would certainly implicate these clauses. Manning therefore cannot avoid our precedent by relying on semantics. Furthermore, in his 2015 appeal Manning *did* allege that the community harvest permits racially discriminated in violation of the equal protection and equal access clauses.[65] Accordingly, Manning's challenge to the community harvest permit condition on the basis of the equal protection and equal access clauses is futile because we have previously rejected identical challenges in *AFWCF* and *Manning II*.

---

[63]     5 AAC 92.072(c)(1)(D).

[64]     *AFWCF*, 347 P.3d 97, 103 (Alaska 2015).

[65]     *See* Brief of Appellant at 26, *Manning II*, 355 P.3d 530 (arguing that "requirements for eligibility that are based on adhering to Ahtna racial customs and traditions . . . unlawfully grant and provide a special preference priority granting new aboriginal rights in violation" of the equal protection and equal access clauses (footnote omitted)).

## 2.     Second count in the proposed amended complaint

The second count in Manning's proposed amended complaint challenged the constitutionality of the point system for allocating Tier II subsistence permits. Specifically, Manning claimed that the system's consideration of (1) the costs of gas and groceries in the applicant's community and (2) the annual hunting factor results in a rural priority, in violation of this court's precedent, equal protection, and the equal access clauses. However, Manning's opening brief does not assert this argument on appeal. Although he does mention this claim superficially in his reply brief, this is not sufficient to correct his failure to initially brief it.[66] Therefore, we consider this argument forfeited and decline to consider it on appeal.[67]

## 3.     Third count in the proposed amended complaint

The third count in Manning's proposed amended complaint challenges the constitutionality of AS 16.05.258(c), the provision of the subsistence statute directing the Board to identify nonsubsistence areas. Alaska Statute 16.05.258(c) provides a number of factors that the Board should consider in making the nonsubsistence determination, including the community's economic stability and income sources and levels. Manning alleges that this provision violates his equal protection and equal access rights. He also claims that the "exclusion of native villages from the non-subsistence use area criteria[] is unconstitutional racial [discrimination]." Manning appears to be concerned

---

[66]     *Adamson v. Univ. of Alaska*, 819 P.2d 886, 889 n.3 (Alaska 1991) ("[W]here a point is given only a cursory statement in the argument portion of a brief, the point will not be considered on appeal."); *see also Hymes v. DeRamus*, 222 P.3d 874, 887-88 (Alaska 2010) (applying waiver rule to pro se litigants).

[67]     Given our conclusion that Manning has forfeited all arguments related to the second count in his proposed amended complaint, we need not consider Ahtna's alternative argument that the claims in the second count are not ripe.

specifically with his claim that "[t]he entire Kenai Peninsula" is designated as a nonsubsistence area.

The superior court correctly determined that addition of this claim would be futile because we rejected this argument over 20 years ago. In *State v. Kenaitze Indian Tribe* we considered whether AS 16.05.258(c) was constitutional and answered in the affirmative.[68] In *Kenaitze Indian Tribe* the plaintiff similarly challenged AS 16.05.258(c) on the basis of equal protection and equal access.[69] In rejecting this challenge, we acknowledged that residents of nonsubsistence areas who wished to subsistence hunt or fish may be inconvenienced by having to travel to a subsistence area but concluded that this inconvenience was not sufficient to exclude them from the subsistence user group.[70] Accordingly, we held that AS 16.05.258(c) did not implicate the equal access clauses because it did not bar any Alaskan from participating in any fish or game user class.[71] Under this precedent, the addition of count three of Manning's proposed amended complaint would be futile.

### 4. Motion to add defendant

Given our conclusion that all of the counts in Manning's proposed amended

---

[68] 894 P.2d 632, 639-42 (Alaska 1995).

[69] *Id.* at 634.

[70] *Id.* at 640-41.

[71] *Id.* at 642. Although we did not explicitly discuss the challenger's equal protection argument, we implicitly rejected this argument by upholding the statute's constitutionality in the face of the challenger's equal protection argument and finding that the statute did not bar participating in the user class. *Id.* at 634, 642; *cf. Alaska Fish Spotters Ass'n v. State, Dep't of Fish & Game*, 838 P.2d 798, 804 (Alaska 1992) (rejecting equal protection challenge to regulation because it "applied equally to all citizens").

complaint are futile or forfeited on appeal, his arguments on appeal relating to his motion to add Ted Spraker as a defendant are moot. And to the extent that Manning's argument that Spraker was "indispensable" was intended to invoke Alaska Civil Rule 19, that rule does not apply to a plaintiff's attempt to add a party. Rather, this rule "prescribes when other parties, absentees, and the courts themselves may override the autonomy of plaintiffs to structure the litigation."[72]

### 5.    Due process arguments

Manning also claims that the superior court violated his substantive and procedural due process rights by denying his motions to amend and to add a party and dismissing the suit with prejudice. He points to three alleged deficiencies. First, he alleges that by denying the motion to amend the superior court violated the tenet that leave to amend should be freely given. Second, he attacks the court's failure to reissue a pretrial scheduling order after we issued our decision in *Manning II*, which was the basis for vacating the prior scheduling order. Finally, he complains that the superior court "sua sponte abruptly" dismissed his suit without waiting for the State or Ahtna to file a dispositive motion. He claims that this allegedly premature dismissal deprived him of the opportunity to conduct discovery and "present additional . . . material factual evidence" and that it "denied [him] witness subpoena review."

These arguments lack merit. First, the denial of the motion to amend did not deprive Manning of due process. It is true that even if the motion to amend is filed after responsive pleadings have been served, leave to amend "shall be freely given when

---

[72]    *Clemensen v. Providence Alaska Med. Ctr.*, 203 P.3d 1148, 1154 n.32 (Alaska 2009).

justice so requires."[73]  However, the superior court does not abuse its discretion in nevertheless denying the motion "if an amendment would be futile because it 'advances a claim . . . that is legally insufficient on its face.' "[74]  Here, the superior court denied the motion on precisely this basis after it concluded that each of the counts in the proposed amended complaint would be futile.  For the reasons discussed above, this denial was not an abuse of discretion and therefore did not violate Manning's due process rights.

Next, with regard to the scheduling order, Alaska Civil Rule 16(b) requires a court to issue a pretrial scheduling order "as soon as practicable but in any event within 90 days after the appearance of the defendants or pursuant to a local uniform pretrial order."  Here, the superior court complied with this directive and issued a pretrial scheduling order in January 2014, less than 90 days after Ahtna's appearance in the case.  But the court later vacated this order and stayed the case pending our decision in *Manning II*; it also repeatedly extended the stay to allow Manning additional appeal opportunities in the pending case.  Manning generally supported this course of action, though he advocated staying the pretrial order rather than vacating it.  The day before the stay expired, Manning filed a motion to amend his complaint.  After hearing oral argument, the superior court denied the motion to amend.  Days later, Manning moved to voluntarily dismiss his complaint.  Given this series of events, the superior court had no opportunity or need to issue a new pretrial scheduling order.  Its failure to issue a new scheduling order did not deprive Manning of due process.

Finally, we reject Manning's argument regarding the lack of a dispositive motion prior to dismissal.  Manning himself moved to voluntarily dismiss his 2013

---

[73]     Alaska R. Civ. P. 15(a).

[74]     *Krause v. Matanuska-Susitna Borough*, 229 P.3d 168, 176-77 (Alaska 2010) (quoting *Hallam v. Alaska Airlines, Inc.*, 91 P.3d 279, 287 (Alaska 2004)).

complaint because he conceded that our opinions had "resolved numerous claims in this case" and because the superior court had denied his motion to amend. The court's dismissal order therefore simply acknowledged what all the parties appeared to agree to — that the claims in Manning's original complaint were futile under our precedents. Moreover, Manning had an opportunity to argue that the complaint should not be dismissed on the grounds asserted by the State and Ahtna. Accordingly, the superior court's dismissal with prejudice did not violate Manning's right to due process.[75]

**B.     The Superior Court Did Not Err In Denying The State's Motion For Attorney's Fees Because Manning's Claims Were Not Frivolous.**

The State cross-appeals the superior court's denial of its motion for 20% of its attorney's fees, totaling $3,479. The superior court denied this motion after it concluded that the constitutional litigant exception exempted Manning from an adverse fee award. On appeal, the State counters that this exception does not apply to Manning because his claims were frivolous.

---

[75]     We have made an effort to identify and discuss each of the arguments raised by Manning on appeal. However, much of Manning's briefing is difficult to follow, so some arguments may have been overlooked. To the extent that Manning is attempting to challenge the process by which the regulations he is challenging were enacted, we decline to consider this argument because it was not argued in the superior court or included in the statement of points on appeal, and it was argued on appeal for the first time in a reply brief. Manning also appears to challenge the superior court's failure to consider certain allegedly relevant evidence. However consideration of such evidence is not necessary if the claims in the proposed amended complaint are facially futile. Finally, Manning's reply brief cites some allegedly inappropriate comments that the superior court made at various points during the case and argues that, collectively, they deprived him of a "fair, neutral, unbiased, and impartial tribunal." We similarly do not consider this argument because it is raised for the first time in a reply brief and is inadequately briefed.

Generally, in a case (such as this) that is resolved without trial and without the prevailing party recovering a money judgment, the court is permitted to award the prevailing party "20 percent of its actual attorney's fees which were necessarily incurred."[76] However, AS 09.60.010 provides an exception shielding certain constitutional litigants from an adverse attorney's fees award. It requires that a non-prevailing litigant satisfy three conditions to qualify for the exception: (1) the litigant must have brought "a civil action or appeal concerning the establishment, protection, or enforcement of a right under the United States Constitution or the Constitution of the State of Alaska"; (2) "the action or appeal asserting the right was not frivolous"; and (3) the litigant "did not have sufficient economic incentive to bring the action or appeal regardless of the constitutional claims involved."[77] Here, the State offers no argument that Manning had an economic incentive to sue, and we accordingly assume that the State concedes this requirement is satisfied.

The State's primary argument on appeal is that, even provided that all of Manning's claims implicated a constitutional right, he is nonetheless ineligible for the exception because all of his claims were frivolous. The State urges that, at least at the time that Manning filed his proposed amended complaint, he knew that all of his claims were either foreclosed by existing precedent or were identical to claims currently pending in his own appeal.

At the outset, we note that we have never conclusively addressed how the frivolousness analysis should be conducted — that is, whether it should be conducted on a claim-by-claim basis or on a more holistic level. Similar to our analysis for whether

---

[76]    Alaska R. Civ. P. 82(b)(2).

[77]    AS 09.60.010(c).

-23-                                                            7252

a claim implicates a constitutional right,[78] we conclude that frivolousness should be evaluated on a claim-by-claim basis.[79] As applied here, this framework requires individually determining whether each claim in Manning's initial complaint and proposed amended complaint was frivolous and awarding fees only for the work that was attributable to any frivolous claim(s).

To assess whether each of Manning's claims is frivolous requires first defining the parameters of the term "frivolous." The statute does not define this term, and we have not previously defined its meaning in the specific context of the constitutional litigant exception. But we find instructive our interpretation of this term in the context of Alaska Civil Rule 11 sanctions, which can be imposed on a party whose filings contain frivolous arguments.[80] We have explained that Rule 11 imposes an objective standard of reasonableness and "should not be used to 'stifle creative

---

[78] *See Manning II*, 355 P.3d 530, 539-40 (Alaska 2015); *Lake & Peninsula Borough v. Oberlatz*, 329 P.3d 214, 227-28 (Alaska 2014).

[79] The federal courts, in interpreting the federal analogue to the constitutional litigant exception, have also assessed frivolousness on a claim-by-claim basis. *See Fox v. Vice*, 563 U.S. 826, 840-41 (2011) ("In a suit . . . involving both frivolous and non-frivolous claims, a defendant may recover the reasonable attorney's fees he expended solely because of the frivolous allegations."); *Harris v. Maricopa Cty. Superior Court*, 631 F.3d 963, 971-72 (9th Cir. 2011); *Quintana v. Jenne*, 414 F.3d 1306, 1311-12 (11th Cir. 2005).

[80] Alaska R. Civ. P. 11(b)(2) (stating that by submitting a pleading, motion, or other paper to the court an attorney or unrepresented party certifies that it contains "claims . . . and other legal contentions . . . warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law"); *see, e.g.*, *Alaska Bldg., Inc. v. Legislative Affairs Agency*, 403 P.3d 1132, 1136-39 (Alaska 2017).

advocacy' or 'chill [a litigant's] enthusiasm in pursuing factual or legal theories.' "[81]  In most cases, then, a claim should not be considered frivolous unless the litigant has "abused the judicial process"[82] or "exhibited an improper or abusive purpose."[83]

Applying these principles, we conclude that none of the claims in either Manning's original complaint or the proposed amended complaint are frivolous.  The two complaints contain the same three primary claims:  (1) the requirement that community harvest permit holders observe the customs and traditions of the community-based pattern of subsistence hunting violates the federal and state equal protection clauses, the equal access clauses of the Alaska Constitution, the public trust doctrine, the Extinguishment Clause of ANCSA, and the Alaska Statehood Act; (2) some of the criteria considered in allocating Tier II subsistence permits — the cost of groceries and gasoline and the annual hunting factor — violate the federal and state equal protection clauses and the equal access clauses of the Alaska Constitution; and (3) the criteria used to establish nonsubsistence hunt areas violate the federal and state equal protection clauses.

With regard to the first count, no aspect of this claim in the original complaint was frivolous because the complaint was filed in 2013, long before our opinions rejecting similar claims were issued in 2015.[84]  And we interpret the same claim

---

[81]    *Alaska Bldg.*, 403 P.3d at 1136 (quoting *Enders v. Parker*, 125 P.3d 1027, 1032 (Alaska 2005)).

[82]    *Id.* at 1137 (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 396 (1990)).

[83]    *Id.*

[84]    *Manning II,* 355 P.3d 530, 536, 538 (Alaska 2015); *AFWCF*, 347 P.3d 97, 102-03 (Alaska 2015).

in Manning's proposed amended complaint as a good-faith argument for modification to existing law that does not evince an improper purpose.[85]  Therefore, though we conclude that the claims are now futile, we decline to characterize them as frivolous.

As for the second count, the annual hunting factor for awarding Tier II subsistence permits is a relatively recent addition to the regulations,[86] and we have never previously considered the validity of this factor.  Accordingly, Manning's argument pertaining to the annual hunting factor is not frivolous.  And though we have previously rejected a challenge to the consideration of the cost of groceries and gasoline,[87] we again interpret Manning's argument on this factor as a good-faith argument for modification to our precedent.  Finally, we also interpret the third count, the challenge to the criteria for establishing nonsubsistence areas, as another good-faith argument for modification of existing law.[88]

---

[85]  *See Alaska Bldg.*, 403 P.3d at 1135 (indicating that Rule 11 authorizes sanctions if a party's pleading is frivolous, i.e., not " 'warranted by existing law or a good faith argument' for changing the law" (quoting *Cooter & Gell*, 496 U.S. at 399)); *see also id.* at 1136 (declining to label a claim "frivolous" merely because it had little likelihood of success under existing law).

[86]  The annual hunting factor — subsection (a)(3) — was added to 5 AAC 92.070 in 2007.

[87]  *Manning I*, 161 P.3d 1215, 1224-25 (Alaska 2007).

[88]  In addition to arguing that Manning's claims were frivolous, the State also argues that his claims did not implicate a constitutional right.  However, this argument appears premised on the State's assertion that Manning's claims were frivolous.  The State urges that, though facially they appear constitutional, Manning's claims cannot qualify because, at the time they were raised, they were foreclosed by this court's precedent or completely lacking in legal support.  Because we conclude that none of Manning's claims are frivolous, the State's argument regarding their constitutional nature also fails, and we conclude the constitutional right requirement is satisfied.

In sum, because none of Manning's claims are frivolous, the constitutional litigant exception shields him from an adverse attorney's fees award. The superior court accordingly did not abuse its discretion in denying the State's motion for attorney's fees.[89]

## V.    CONCLUSION

We AFFIRM the judgment of the superior court.

---

[89]    Because we conclude that the constitutional litigant exception applies to Manning, we do not address the State's argument for an enhanced attorney's fees award.